## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1.Barbara Henderson, *et al.*,<br><br>                Plaintiffs,<br>  v.<br><br>1.Ford Motor Company,<br><br>              Defendant. | CIV-19-941-PRW<br>Civil Action No.: _____<br><br>**COMPLAINT AND**<br>**DEMAND FOR JURY TRIAL** |

For this Complaint, Plaintiff Barbara Henderson and all Plaintiffs identified in <u>Exhibit A</u> to this complaint, by undersigned counsel, state as follows:

### PRELIMINARY STATEMENT

1.     This is not a class action, but a group action brought by owners and/or lessees of Ford Motor Company manufactured automobiles sold with defective and dangerous Takata airbags.

2.     An automotive component supplier that manufactures and sells airbags in automobiles and vehicle manufacturers must take all necessary steps to ensure that its products – which can literally mean the difference between life and death in an accident – function as designed, specified, promised, and intended.  Profits take a back seat to safety for the airbag manufacturer and the automobile manufacturer in making its product sourcing decisions.  Yet Takata Corporation, and its related entities ("Takata"), and Ford Motor Company ("Ford" and/or "Manufacturer") put profits ahead of safety.  Takata cut corners to build cheaper airbags, and Ford bought their airbags from Takata to save money.  The result is that instead of saving lives, faulty Takata airbags are killing and maiming drivers and passengers involved in otherwise minor and survivable accidents.  Even more alarming, rather than take the issue head-on and

immediately do everything in their power to prevent further injury and loss of life, Takata and Ford have engaged in a ten-year pattern of deception and obfuscation, only very recently beginning a complete recall of affected vehicles.

3.     Airbags are a critical component in the safety features of virtually every motor vehicle sold in the United States and throughout the world.  Currently, about 37,000 people are killed in motor vehicle accidents each year in the United States.  Remarkably, that number is nearly half of what it was in 1972, when over 54,000 Americans died in car crashes.  The drastic reduction is, in large part, due to tremendous advances in vehicle occupant safety, including the widespread use of seatbelts and airbags.

4.     In order to prevent serious injury and death resulting from bodily impact with the hard interior surfaces of automobiles, like windshields, steering columns, dashboards, and pillars, upon a vehicle experiencing a specified change in velocity in a collision, accelerometers and sensors in the vehicle frame trigger the vehicle airbags to deploy.  Because collisions can occur at rates of speed that can cause serious injury, to be effective, airbags must deploy timely and at appropriate velocity to be effective, but not subject the occupant to additional unnecessary harm. To accomplish this, the airbag system uses highly conductive metals, such as gold, and small explosive charges to immediately inflate the airbags upon being triggered.  This case flows directly from the now-admitted fact that Takata's explosive charge components in its airbag systems were defectively manufactured since as early as 2001, and perhaps earlier.

5.     Rather than deploying the airbags to prevent injuries, the defective Takata airbag inflators quite literally blew up like hand-grenades, deploying at excessive forces and in many incidents, sending lethal metal and plastic shrapnel into the vehicle cockpit and into the bodies of the drivers and passengers.

6.     Takata and Ford knew of the deadly airbag defect at least 17 years ago, but did nothing to prevent ongoing injury and loss of life.  Takata's first airbag defect recall stemmed from defective manufacturing in 2000, but was limited (by Takata) to a recall of select Isuzu vehicles.  In Alabama, in 2004, a Takata airbag in a Honda Accord exploded, shooting out metal fragments which gravely injured the driver.  Honda and Takata unilaterally deemed it "an anomaly" and did not issue a recall, adequately investigate themselves, or seek the involvement of federal safety regulators.  Instead, they brushed it under the rug:  Takata kept making defective airbags; and Honda and other vehicle manufacturers like Ford kept putting them in its vehicles while marketing them as highly safe and of high quality.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this matter pursuant to the Magnuson-Moss Federal Act, 15 U.S.C. § 2310(d)(1)(B), in that the Plaintiffs claim more than $50,000.00 in damages, exclusive of interest and costs, and under the doctrine of supplemental jurisdiction as set forth in 28 U.S.C. § 1367.

8.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(1) as Defendant is subject to personal jurisdiction in this District and where Defendant, as principal, directs and controls repairs of Ford-manufactured vehicles through its agents consisting of a dealership network located in this District.

9.     Further, venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events giving rise to the Plaintiffs' claims occurred within this District.

## PARTIES

10.    Plaintiff Barbara Henderson is an adult individual who resides in Oklahoma City, Oklahoma, and owns a 2012 Ford Fusion, Vehicle Identification Number 3FAHP0HA6CR420853.

11.    All Plaintiffs identified in Exhibit A were, at all relevant times, adult individuals who either reside in Oklahoma or who purchased motor vehicles in Oklahoma which were manufactured or sold by Defendant.

12.    Defendant Ford Motor Company (hereafter "Ford" or "Defendant") is a business entity with a principal place of business at One American Road, Dearborn, Michigan 48126.  At all relevant times, Ford engaged in the business of marketing, supplying, and selling motor vehicles accompanied by written warranties to the public at large through a system of authorized dealerships in the State of Oklahoma and throughout the United States.

## FACTUAL ALLEGATIONS APPLICABLE TO ALL PLAINTIFFS

13.    As used in this Complaint, "Defective Vehicles" refers to all vehicles purchased or leased in the United States that have airbags manufactured by Takata and have been subject to an airbag-related warning or recall, including, but not limited to, the following Ford manufactured vehicles:

- 2007-2010 Ford Edge

- 2006-2012 Ford Fusion

- 2005-2006 Ford GT

- 2005-2014 Ford Mustang

- 2004-2011 Ford Ranger

- 2007-2010 Lincoln MKX

- 2006-2012 Lincoln Zephyr/MKZ

- 2006-2011 Mercury Milan

14.     The Defective Vehicles contain airbags manufactured by Takata that, instead of protecting vehicle occupants from bodily injury during accidents, violently explode using excessive force, and in many incidents, expel lethal amounts of metal debris and shrapnel at vehicle occupants.

15.     All Takata airbags in the Defective Vehicles share a common, uniform defect:  the use of ammonium nitrate, a notoriously volatile and unstable compound, as the propellant in their defectively designed inflators (the "Inflator Defect").  The inflator, as its name suggests, is supposed to inflate the airbag upon vehicle impact.  In the milliseconds following a crash, the inflator ignites a propellant to produce gas that is released into the airbag cushion, causing the airbag cushion to expand and deploy.

16.     "Defective Airbags" refers to all airbag modules (including inflators) manufactured by Takata that are subject to the recalls, all Takata airbags subject to any subsequent expansion of pre-existing recalls, and new recalls, relating to the tendency of such airbags to over-aggressively deploy, rupture, or fail to deploy.  All Defective Airbags contain the Inflator Defect.  As a result of the Inflator Defect, Defective Airbags have an unreasonably dangerous tendency to:  (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether.

17.     Airbags are meant to inflate timely during an automobile collision, but with only such force necessary to cushion the occupant from impact to the vehicle's interior and not cause

additional enhanced injury.  When people operate a motor vehicle or ride in one as a passenger, they trust and rely on the manufacturers of those motor vehicles to make those vehicles safe.

18.    In the late 1990s, Takata shelved a safer chemical propellant in favor of ammonium nitrate, a far cheaper and more unstable compound that is much better suited for large demolitions in mining and construction.

19.    Under ordinary conditions, including daily temperature swings and contact with moisture in the air, Takata's ammonium nitrate propellant transforms and destabilizes, causing irregular and dangerous behavior ranging from inertness to violent combustion. When Takata decided to abandon the safer propellant in favor of the more dangerous but cheaper one, it was aware of these risks and did so over the objections and concerns of its engineers in Michigan. Tellingly, Takata is the only major airbag manufacturer that uses ammonium nitrate as the primary propellant in its airbag inflators.

20.    As a result of the common, uniform Inflator Defect, instead of protecting vehicle occupants from bodily injury during accidents, the defective Takata airbags too often either fail to deploy or violently explode, sometimes expelling metal debris and shrapnel at vehicle occupants.  As of January 2015, complaints to regulators blame Takata airbags for at least seven deaths and 139 injuries, including at least 37 reports of airbags that ruptured or spewed metal or chemicals.

21.    When Ford purchased Takata's airbags for their vehicles, it was aware that the airbags used the volatile and unstable ammonium nitrate as the primary propellant in the inflators.

22.     The volatility and instability of Takata's ammonium nitrate propellant has been underscored by the glaring and persistent quality control problems that have plagued Takata's manufacturing operations.

23.     The manufacturing defect in Takata's airbags dates back to at least April 2000, when, according to one recall notice, some Takata airbags produced between April 2000 and September 2002 contained manufacturing defects.  Takata became aware of the defect at least as early as 2001 when the first recall was issued relating to the exploding Takata airbags in Isuzu vehicles.

24.     In 2004, a Takata airbag in a Honda Accord exploded in Alabama, shooting out metal shrapnel and severely injuring the car's driver.  Honda and Takata deemed the incident "an anomaly" and did nothing about it.  Honda did not issue a recall.  Neither Honda nor Takata sought the involvement of federal safety regulators.  In fact, Honda did not tell regulators about this event until an inquiry into its 2009 recall, the first with respect to the Takata airbags.  After additional Takata-manufactured airbags ruptured, Honda issued additional recalls in 2010, 2011, 2013 and 2014.

25.     Only in 2008 did U.S. safety regulators begin to slowly become apprised of the serious dangers posed by the lethal Takata airbags, and even then federal officials lacked a complete and accurate understanding of the risks due to the Takata's obfuscation and destruction of relevant documents.  Indeed, Honda received three additional reports of airbag rupture incidents in 2007, but never issued recalls or told U.S. safety regulators that the incidents involved exploding airbags.  Finally, in November 2008, Honda informed U.S. authorities that it had a problem with some of the Takata airbags installed in its vehicles.  However, at that time Honda recalled only 4000 Accords and Civics.

26.    In April 2009, six months after the limited 2008 recall, a Takata airbag in a Florida resident's Honda Civic exploded after a minor accident. The lethal explosion sent a two-inch piece of shrapnel from the airbag flying into the driver's neck. Although the driver survived, when highway troopers found her, blood was gushing from a gash in her neck. The driver's car was not part of the 2008 Recall.

27.    In May 2009, a month after the above accident, an 18-year-old driver was killed while driving a 2001 Honda Accord when the Takata airbag in her car exploded after her car bumped into another car in a parking lot. While she apparently survived her accident, the metal shrapnel that shot out of the exploding Takata airbag sliced open her carotid artery and she bled to death. Her car was not one of those recalled six months earlier by Honda.

28.    It wasn't until two months after this death that Honda expanded its 2008 recall to about 400,000 vehicles, summoning back additional 2001 and 2002 Acura, Civic, and Accord models.

29.    In recent incidents, first responders have been baffled by the fact that victims of apparently minor accidents suffered injuries more consistent with being shot or stabbed repeatedly, or unexplained cervical fractures.

30.    For example, around July 2014, a South Florida resident was involved in a crash while driving her 2001 Honda Civic. While she survived the automobile accident, she was badly injured when a chunk of metal exploded from her car's Takata airbag into her forehead.

31.    On September 29, 2014, a Florida resident died four days after her 2001 Honda Accord struck another car in Orlando and the Takata airbag exploded, sending shrapnel into her neck. The medical examiner stated that the shrapnel tore through the airbag, hitting the driver and causing "stab-type wounds" and cutting her trachea. Indeed, her death was initially

investigated as a homicide by detectives. A week after she died, a letter arrived at her house in the mail from Honda urging her to get her car fixed because of faulty airbags that could explode.

32.     Despite this shocking record, both Takata and the vehicle manufacturers, including Ford, have been slow to report the full extent of the danger to drivers and passengers and have failed to issue appropriate recalls. Both Ford and Takata provided contradictory and inconsistent explanations to regulators for the defects in Takata's airbags, leading to more confusion and delay. Indeed, the danger of exploding airbags and the number of vehicles affected was not disclosed for years after it became apparent there was a potentially lethal problem. Instead, Takata and Ford repeatedly failed to fully investigate the problem and issue proper recalls, allowing the problem to proliferate.

33.     Ford was on notice as early as 2008 when Honda first notified regulators of a problem with its Takata airbags. Ford knew or should have known at that time that there might be a safety problem with the Ford manufactured vehicles equipped with Takata airbags and should have launched its own investigation and notified customers.

34.     In June 2014, NHTSA announced that BMW, Chrysler, Ford, Honda, Mazda, Nissan, and Toyota were conducting limited regional recalls to address a possible safety defect involving Takata brand airbag inflators, with approximately 58,669 Ford vehicles being subject of this limited campaign. The action was influenced by a NHTSA investigation into six reports of airbag inflator ruptures, all of which occurred in Florida and Puerto Rico.

35.     On October 22, 2014, NHTSA expanded the recall list to cover ten automakers and 7.8 million vehicles, over 5 million of which were Hondas. In a Consumer Advisory dated October 22, 2014, NHTSA sent an urgent warning to the owners of the now "7.8 million Affected Vehicles":

The National Highway Traffic Safety Administration urges owners of certain Toyota, Honda, Mazda, BMW, Nissan, Mitsubishi, Subaru, Chrysler, Ford and General Motors vehicles to act immediately on recall notices to replace defective Takata airbags. Over seven million vehicles are involved in these recalls, which have occurred as far back as 18 months ago and as recently as Monday. The message comes with urgency, especially for owners of vehicles affected by regional recalls in the following areas: Florida, Puerto Rico, limited areas near the Gulf of Mexico in Texas, Alabama, Mississippi, Florida, and Louisiana, as well as Guam, Saipan, American Samoa, Virgin Islands and Hawaii.

36.    On October 29, 2014, NHTSA sent letters to ten automakers regarding the safety risks posed by the Takata airbags.  The letter stated that "[t]he ongoing cooperation of all manufacturers who have recalled vehicles is essential to address this safety risk," and that the "NHTSA team is engaged with you in critical work to better understand the failures and take action to remedy the safety risk…."  NHTSA's letter also asked the automakers to provide NHTSA with information as to their recall process, urged a faster response from them, and stated that "more can and should be done as soon as possible to prevent any further tragedies."

37.    The U.S. Department of Justice also opened an investigation whether Takata committed any crimes.  On November 13, 2014, the United States District Court for the Southern District of New York issued a federal grand jury subpoena to Takata and Honda.

38.    By November 2014, in anticipation of a United States Senate hearing to be attended by Takata and the major automakers, NHTSA demanded that the recall be expanded to the entire country for certain driver's side airbags, citing airbag rupture incidents in North Carolina and California.  Incredibly, Takata refused, and testified at Congressional hearings that vehicles in non-humid regions were safe, even as it claimed that it had not yet determined the root cause of the failures.

39.     With additional pressure and public scrutiny, Takata and affected vehicle manufacturers eventually agreed to NHTSA's demand.  At that point, the total number of recalled vehicles escalated to approximately 17 million in the United States and 25 million worldwide.

40.     On December 18, 2014, Ford announced its first national recall campaign involving only about 462,911 vehicles, principally for driver side airbags.

41.     Having misrepresented and omitted the nature and scope of the Inflator Defect for over a decade, the 10 vehicle manufacturers, including Ford, met in December 2014 to "sort out a way to understand the technical issues involved."

42.     In response to public scrutiny and pressure from NHTSA and private plaintiffs, Ford, Takata, and other vehicle manufacturers, were forced to consult with external explosives and airbag specialists, and performed additional testing on Takata's airbags.  This testing confirmed what Ford, Takata, and other vehicle manufacturers already knew:  Takata's airbags containing ammonium nitrate were defective and prone to over-aggressive deployment and rupture.

43.     In light of this testing, Takata was unable to deny the existence of the Inflator Defect any longer.  On May 18, 2015, Takata filed four Defect Information Reports ("DIRs") with NHTSA and agreed to a Consent Order regarding its (1) PSDI, PSDI-4, and PSDI-4K driver air bag inflators; (2) SPI passenger air bag inflators; (3) PSPI-L passenger air bag inflators; and (4) PSPI passenger air bag inflators, respectively.  After concealing the Inflator Defect for more than a decade, Takata finally admitted that "a defect related to motor vehicle safety may arise in some of the subject inflators."  And in testimony presented to Congress following the submission of its DIRs, Takata's representative admitted that the use of ammonium nitrate was a factor that

contributed to the tendency of Takata's airbags to rupture, and that as a result, Takata would phase out the use of ammonium nitrate.

44.     As a result of Takata's admission that its inflators are defective, in January of 2017, Ford expanded its recall to 816,000 Ford, Lincoln, and Mercury vehicles made in North America, including 654,695 sold in the U.S.  Although most vehicles were included in prior recall actions, the new recall added the passenger-side airbag inflators.

45.     On January 13, 2017, Takata pleaded guilty to deceiving automakers about the safety of its airbags.

46.     In March of 2017, Ford recalled another 32,000 2016-17 Ford Edge, 2016-17 Lincoln MKX and 2017 Lincoln Continental vehicles to replace the driver frontal airbag module, and expended the recall yet again in July of 2017.

47.      In January of 2018 the NHTSA issued an advisory urging owners of 2006 Ford Ranger pickup trucks to stop driving them after it confirmed a second Takata airbag-related death involving the 2006 Ford Ranger, and in February of 2018 issued a rare stop-driving recall affecting 30,603 2006 Ford Ranger vehicles until their defective airbags are replaced.

48.     In January of 2019, Ford expended its recall yet again by recalling 782,384 Ford, Lincoln, and Mercury vehicles to have their passenger-side front airbag inflators replaced.

49.     Over the past 17 years that Takata has known there was a problem with the safety of its airbags, there have been at least seven deaths and 139 injuries linked to defective Takata airbags.  As detailed above, the incidents date back to at least 2003, and involve vehicles made by Acura, BMW, Chevrolet, Ford, Honda, Mazda, Subaru, and Toyota.  Therefore, Ford knew of the Inflator Defect by virtue of these incidents, but failed to disclose the nature and scope of the Inflator Defect.

50.    Defendant was on further notice due to unusual Takata airbag deployments that should have prompted further inquiry into the airbags' fitness for use.  A review of publicly available NHTSA complaints shows dozens of incidents of Takata airbags inadvertently deploying in the vehicles equipped with defective Takata airbags, an event that may be tied to the unstable and volatile ammonium nitrate propellant.  These complaints started as early as September 2005, and involve vehicles manufactured by Acura, BMW, Dodge, Ford, Mitsubishi, Pontiac, Subaru, and Toyota.  Some of these incidents showed still further signs of the Inflator Defect, including airbags that deployed with such force that they caused the windshield to crack, break, or shatter, and others that caused unusual smoke and fire (or both).

51.    In light of recalled vehicles reaching over 34 million, and due to unavailability of parts, consumers found themselves in the frightening position of having to drive dangerous vehicles for many years while they wait for Ford to replace the defective airbags in their cars.  For example, Ford has recommended owners prohibit anyone from riding in the passenger seat until the defective passenger side airbag is replaced.  As a result, many consumers were effectively left without a safe vehicle to take them to and from work, to pick up their children from school or childcare, or, in the most urgent situations, to transport themselves or someone else to a hospital.

52.    Ford knew or should have known that the Takata airbags installed in hundreds of thousands of its vehicles were defective.  Both Takata and Ford, who concealed their knowledge of the nature and extent of the defect from the public while continuing to advertise their products as safe and reliable, have shown a blatant disregard for public welfare and safety.  Moreover, Ford has violated their affirmative duty, imposed under the Transportation Recall Enhancement,

Accountability, and Documentation Act (the "TREAD Act"), to promptly advise customers about known defects.

53.    Even before purchasing inflators from Takata, Ford was aware that Takata used volatile and unstable ammonium nitrate as the primary propellant in its inflators, and thus Ford was on notice of the Inflator Defect even before it installed the inflators in the Ford vehicles, because Takata reviewed the designs of the inflators with Ford and Ford approved the designs. Ford was also put on notice of the Inflator Defect no later than 2008, when Honda first notified regulators of a problem with its Takata airbags. Because Ford's vehicles also contained Takata airbags, Ford knew or should have known at that time that there was a safety problem with its airbags, and Ford should have launched its own investigations and notified its customers. That responsibility only grew as incidents multiplied.

54.    Instead, Ford put profits ahead of safety. Takata cut corners to build cheaper airbags, and Ford sold Plaintiffs vehicles that it knew or should have known contained those defective airbags. For several years Ford engaged in a pattern of reckless disregard, deception, concealment, and obfuscation, and sold its vehicles as "Safe" and "Reliable."

55.    Examples of Ford's safety and reliability representations, from 2006 through the present, include the following:

    a.    In 2006, Ford represented in brochures that its cars possessed "up-to-the-minute safety and security systems help protect you and your passengers out there on the road."

    b.    In 2006, Ford also represented in brochures that its cars contained a: "Personal Safety System®," which "enhances protection for the driver and front passenger in certain frontal collisions. The system customizes the deployment of the dual-

stage front airbags based on several criteria, including the driver's seat position, whether the front safety belts are in use, the amount of pressure exerted on the front-passenger's seat, and the overall severity of the impact."

c.  In 2015, Ford represented on its website: "At Ford, we hold ourselves to very high standards for vehicle safety. The fact is, vehicle safety is a critical part of our brand promise to Go Further. We aim to give customers peace of mind and make the world safer by developing advanced safety technologies and making them available across a wide range of vehicles."

56.     As a result of Ford's misconduct, Plaintiffs were harmed and suffered actual damages.  The defective Takata airbags significantly diminish the value of the vehicles in which they are installed.

57.     Plaintiff Barbara Henderson and all Plaintiffs identified in Exhibit A purchased their Defective Vehicles primarily for personal, family, and household use.  Plaintiff Barbara Henderson and all Plaintiffs identified in Exhibit A were harmed and suffered actual damages. The defective Takata airbags significantly diminish the value of the vehicles in which they are installed.  Such vehicles have been stigmatized as a result of being recalled and equipped with Takata airbags, and the widespread publicity of the Inflator Defect.

58.      Further, Plaintiff Barbara Henderson and all Plaintiffs identified in Exhibit A did not receive the benefit of their bargain; rather, they purchased and leased vehicles that are of a lesser standard, grade, and quality than represented, and they did not receive vehicles that met ordinary and reasonable consumer expectations regarding safe and reliable operation.  Plaintiff Barbara Henderson and all Plaintiffs identified in Exhibit A paid, either through a higher purchase price or higher lease payments, more than they would have had the Inflator Defect been

disclosed.  Plaintiff Barbara Henderson and all Plaintiffs identified in <u>Exhibit A</u> were deprived of having a safe, defect-free airbag installed in their vehicles, and Ford unjustly benefited from its unconscionable delay in recalling its defective products, as it avoided incurring the costs associated with recalls and installing replacement parts for many years.

59.     Plaintiff Barbara Henderson and all Plaintiffs identified in <u>Exhibit A</u> also suffered damages in the form of out-of-pocket and loss-of-use expenses and costs, including but not limited to expenses and costs associated with taking time off from work, paying for rental cars or other transportation  arrangements, and child care.

60.     The defective Takata airbags create a dangerous condition that gives rise to a clear, substantial, and unreasonable danger of death or personal injury to Plaintiff Barbara Henderson and all Plaintiffs identified in <u>Exhibit A</u>.

## **FORD'S LIMITED EXPRESS WARRANTY**

61.     In connection with the sale and/or lease of each one of its new Defective Vehicles, Ford provided express limited warranty on each Defective Vehicle, such as the New Vehicle Limited Warranty ("NVLW") and the Safety Belts and Air Bag Supplemental Restraint System Warranty that promised to fix both design and manufacturing defects.

62.     In its New Vehicle Limited Warranty and in advertisements, brochures, press kits, and other statements in the media, Ford expressly warranted that it would repair or replace defects in material or workmanship free of charge if they became apparent during the warranty period.

63.     Ford also expressly warranted that it would remedy any defects in the design and manufacturing processes that result in vehicle part malfunction or failure during the warranty period.

64.    The following uniform language appears in all 2007-2014 Ford Warranty Guides:

> Your NEW VEHICLE LIMITED WARRANTY gives you specific legal rights. You may have other rights that vary from state to state. Under your New Vehicle Limited Warranty if . . . your Ford vehicle is properly operated and maintained, and . . . was taken to a Ford dealership for a warranted repair during the warranty period, then authorized Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship.

> This warranty does not mean that each Ford vehicle is defect free. **Defects may be unintentionally introduced into vehicles during the design and manufacturing processes and such defects could result in the need for repairs.** For this reason, Ford provides the New Vehicle Limited Warranty in order to remedy any such defects that result in vehicle part malfunction or failure during the warranty period.

65.    With regard to Defective Vehicles, the duration of the NVLW for bumper-to-bumper protection is three years or 36,000 miles, whichever comes first.

66.    For all 2007-2014 Defective Vehicles, the Air Bag Supplemental Restraint System Warranty is five years or 60,000 miles, whichever comes first.

67.    Further, all 2004-2006 Ford Warranty Guides state Ford "will repair, replace, or adjust all parts on [Plaintiffs'] vehicle[s] that are defective in factory-supplied materials or workmanship" and warrants "air bag Supplemental Restraint System (SRS) against defects in factory-supplied materials or workmanship" for five years or 50,000 miles, whichever occurs first.

## TOLLING OF STATUTES OF LIMITATIONS

### I.    Fraudulent Concealment Tolling

68.    Plaintiffs did not and could not have known that the vehicles were equipped with Defective Airbags at the time that they purchased the subject vehicles or any time thereafter.

17

69.     The breach of warranties four-year statute of limitations, which might otherwise apply to bar some of the Plaintiffs' claims, should be tolled because of Defendant's knowing and active concealment of the fact that the subject vehicles were equipped with defective airbags.

70.     Takata has known of the Inflator Defect in the Defective Vehicles since at least 1990s.  Prior to installing the airbags with Inflator Defect in its vehicles, Ford knew or should have known of the Inflator Defect, because Takata informed Ford that the airbags contained the volatile and unstable ammonium nitrate.  In addition, Ford was again made aware of the Inflator Defect in Takata's airbags no later than 2008 following the rupture incidents in Honda vehicles equipped with the same defective airbags.  Ford has concealed from or failed to notify Plaintiffs of the full and complete nature of the Inflator Defect.

71.     Although Ford has now acknowledged that Takata airbags in its vehicles are defective, for years, Ford did not fully investigate or disclose the seriousness of the issue and in fact downplayed the widespread prevalence of the problem.

72.     Any applicable statute of limitations has therefore been tolled by Ford's knowledge, active concealment, and denial of the facts alleged herein.

## II.     Discovery Rule Tolling

73.     The causes of action alleged herein did not accrue until Plaintiffs discovered that their vehicles had the airbags with Inflator Defect.

74.     Plaintiffs, however, had no realistic ability to discern that the vehicles were defective until – at the earliest – after either the defective airbag exploded or their vehicles were recalled.  And even then, Plaintiffs had no reason to discover their causes of action because of Ford's active concealment of the true nature of the defect.

### III.     Estoppel

75.     Ford was under a continuous duty to disclose to the Plaintiffs the true character, quality, and nature of the subject vehicles.

76.     Ford knowingly, affirmatively, and actively concealed the true nature, quality, and character of the subject vehicles from Plaintiffs, and knowingly made misrepresentations about the quality, reliability, characteristics, and performance of the vehicles.

77.     Plaintiffs reasonably relied upon Ford's knowing and affirmative misrepresentations and/or active concealment of these facts.  Based on the foregoing, Ford is estopped from relying on any statute of limitations in defense of this action.

### IV.     Class Action Tolling

78.     All Plaintiffs opted out of the class action settlement reached in *Koehler, et al. v. Takata Corporation, et al.* (Case No. 1:14-cv-24009; MDL No. 2599). *See* Exhibit A.

The statutes of limitation applicable to Plaintiffs' claims – including, without limitation, their express warranty – are tolled by class action tolling in light of the *Koehler, et al. v. Takata Corporation, et al.* (Case No. 1:14-cv-24009) Complaint, filed October 27, 2014, and Second Amended Complaint, filed June 15, 2015, (attached hereto as Exhibit B). *See Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 350, 103 S. Ct. 2392, 2396 (1983) ("The filing of a class action tolls the statute of limitations 'as to all asserted members of the class'").

**FIRST CAUSE OF ACTION**
**Breach of Warranty Pursuant to the Magnuson-Moss**
**Warranty Act, 15 U.S.C. §2301, *et seq.***

79.     The Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

80.     Each Plaintiff is a "consumer" as defined in 15 U.S.C. § 2301(3).

81.     Defendant is a "supplier" and "warrantor" as defined in 15 U.S.C. § 2301(4) and (5).

82.     Defective Vehicles are each a "consumer product" as defined in 15 U.S.C. § 2301(6).

83.     15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with the written and implied warranties.

84.     The Defendant's failure to repair the Inflator Defect in the Defective Vehicles within the applicable warranty period constitutes a breach of the written and implied warranties applicable to the Defective Vehicles.

85.     Defendant has failed to remedy the Defective Vehicles' defects within a reasonable period of time, and/or a reasonable number of attempts, thereby breaching the written and implied warranties applicable to the Defective Vehicles.

86.     Any efforts to limit the implied warranties in a manner that would exclude coverage of the subject vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the subject vehicles is null and void.

87.     Any limitations on the warranties are procedurally unconscionable.  There was unequal bargaining power between the Defendant, on the one hand, and Plaintiffs, on the other.

88.     Any limitations on the warranties are substantively unconscionable.  Defendant knew that the subject vehicles were defective and would continue to pose safety risks after the warranties purportedly expired.  Defendant failed to disclose the Inflator Defect to Plaintiffs.  Thus, the Defendant's enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

89.     Defendant's breach of the written and implied warranties constitutes a breach of the Magnusson-Moss Warranty Act, 15 U.S.C. §2301, *et seq.*

90.     As a result of Defendant's breach of the written and implied warranties, and Defendant's failure to remedy the same within a reasonable time, Plaintiffs have suffered damages.

91.     The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiffs seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial.  In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs in connection with the commencement and prosecution of this action.

## SECOND CAUSE OF ACTION
### Breach of Express Warranty under 12A OK Stat § 12A-2-313

92.     Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

93.     In connection with the sale or lease of the Defective Vehicles to Plaintiffs, Defendant provided Plaintiffs with a New Vehicle Limited Warranty, under which it agreed to repair original components found to be defective in material or workmanship.

94.     Defendants expressly represented and warranted, by and through statements, descriptions and affirmations of fact made by them and their authorized agents and representatives, that the Defective Vehicles were safe for ordinary use.

95.     Plaintiffs relied on Defendant's warranties when they agreed to purchase or lease the Defective Vehicles and Defendant's warranties were part of the basis of the bargain.

96.    The Defective Vehicles failed to comply with the express warranties because they suffered from the inherent Inflator Defect that, from the date of purchase forward, rendered the Defective Vehicles unfit for their intended use and purpose and made them not free from defects.

97.    Defendant knew or had reason to know that the Defective Vehicles did not conform to the express representations because the vehicles were neither as safe, usable, or free from defects as represented.

98.    Plaintiffs notified Defendant of the breach within a reasonable time and/or were not required to do so because affording Defendant a reasonable opportunity to cure their breach of written warranty would have been futile.

99.    Plaintiffs have given Defendant reasonable opportunity to cure said defect, but Defendant has been unable to do so within a reasonable time.

100.    As a result of said nonconformities, Plaintiffs cannot reasonably rely on the Defective Vehicles for the ordinary purpose of safe, comfortable, and reliable transportation.

101.    Plaintiffs could not reasonably have discovered said nonconformities with the Defective Vehicles prior to Plaintiffs' acceptance of their respective Vehicles.

102.    Plaintiffs would not have purchased the Defective Vehicles, or would have paid less for the Defective Vehicles, had they known, prior to their respective time of purchase or lease, that Defective Vehicles suffered from the Inflator Defect.

103.    As a direct and proximate cause of Defendant's breach, Plaintiffs have suffered damages and continue to suffer damages, including economic damages at the point of sale or lease, that is, the difference between the value of the vehicle as promised and the value of the vehicle as delivered.

104.    Plaintiffs are entitled to legal relief against Defendant, including damages, consequential damages, attorneys' fees, costs of suit, and other relief as appropriate.

### THIRD CAUSE OF ACTION
**Breach of Implied Warranty of Merchantability Pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. §2301, *et seq.* and 12A OK Stat § 12A-2-314**

105.    Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

106.    Defendant is a merchant with respect to motor vehicles.

107.    The subject vehicles were each subject to implied warranties of merchantability, as defined in 15 U.S.C. § 2308 and 12A OK Stat § 12A-2-314, running from the Defendant to the Plaintiffs.

108.    Under 12A OK Stat § 12A-2-314, a warranty that the subject vehicles, and by extension, the Defective Airbags, were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their vehicles.

109.    Namely, as a part of the implied warranty of merchantability, Defendant warranted that the subject vehicles were fit for their ordinary purpose as safe passenger motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

110.    The subject vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used, because they are fitted with Defective Airbags containing the Inflator Defect which causes, among other things, the Defective Airbags to:  (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyperaggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether.  Defendant has admitted that the subject vehicles are defective in issuing its recalls.

111.    Plaintiffs, at all relevant times, were intended third-party beneficiaries of: (a) Takata's sale of the Defective Airbags to the Defendant, and (b) the Defendant's sale of vehicles containing the Defective Airbags to Plaintiffs.

112.    Defendant was provided notice of these issues by its knowledge of the issues, by customer complaints, by numerous complaints filed against it and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers before or within a reasonable amount of time after Ford issued the recalls and the allegations of the Inflator Defect became public.

113.    Furthermore, affording the Defendant an opportunity to cure its breach of written warranties would be unnecessary and futile here.  At the time of sale or lease of each subject vehicle, Defendant knew, should have known, or was reckless in not knowing of its misrepresentations concerning the subject vehicle's inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defect.  Under the circumstances, any requirement that Plaintiffs provide Defendant a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

114.    Nevertheless, Plaintiffs notified Defendant of the Airbag Defects in the subject vehicles within a reasonable time after Plaintiffs discovered them, but Defendant failed to cure the defect within reasonable time.

115.    Plaintiffs would suffer economic hardship if they returned their vehicles but did not receive the return of all payments made by them.  Because the Defendant is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs have not re-accepted their defective vehicles by retaining them.

116.     As a result of Defendant's breach of the implied warranty of merchantability, Plaintiffs have suffered damages, including but not limited to incidental and consequential damages.

### FOURTH CAUSE OF ACTION
### Unjust Enrichment

117.     Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

118.     Defendant has received and retained a benefit from the Plaintiffs and inequity has resulted.

119.     Defendant benefitted through its unjust conduct, by selling subject vehicles with a concealed safety-and-reliability related defect, at a profit, for more than these vehicles were worth, to Plaintiffs, who overpaid for these vehicles, and/or would not have purchased these vehicles at all; and who have been forced to pay other costs.

120.     It is inequitable for Defendant to retain these benefits.

121.     Plaintiffs do not have an adequate remedy at law.

122.     As a result of Defendant's conduct, the amount of its unjust enrichment should be disgorged, in an amount to be proven at trial.

### FIFTH CAUSE OF ACTION
### Fraudulent Concealment

123.     The Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

124.     Defendant concealed and suppressed material facts regarding the subject vehicles – most importantly, the fact that they were equipped with Defective Airbags which, among other things, (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of

serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether.

125.    Defendant took steps to ensure that its employees did not reveal the known safety Inflator Defect to regulators or consumers.

126.    Defendant had a duty to disclose the Inflator Defect because it:

    a.    Had exclusive and/or far superior knowledge and access to the facts, and Defendant knew the facts were not known to or reasonably discoverable by the Plaintiffs;

    b.    Intentionally concealed the foregoing from the Plaintiffs; and/or

    c.    Made incomplete representations about the safety and reliability of the subject vehicles, while purposefully withholding material facts from the Plaintiffs that contradicted these representations.

127.    These omitted and concealed facts were material because they would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle, and because they directly impact the value of the subject vehicles purchased or leased by the Plaintiffs. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer. Indeed, Plaintiffs trusted Defendant not to sell or lease them vehicles that were defective or that violated federal law governing motor vehicle safety.

128.    Defendant concealed and suppressed these material facts in order to falsely assure purchasers and consumers that its vehicles were capable of performing safely as represented by Defendant and reasonably expected by consumers.

129.    Defendant actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Defendant money, and it did so at the expense of the Plaintiffs.

130.    Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.

131.    Because of the concealment and/or suppression of the facts, Plaintiffs sustained damage because they own vehicles that diminished in value as a result of Defendant's concealment of, and failure to timely disclose, the serious Inflator Defect in hundreds of thousands of its vehicles and the serious safety and quality issues caused by Defendant's conduct.

132.    Had they been aware of the Defective Airbags installed in their vehicles, and the Defendant's callous disregard for safety, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Defendant's fraudulent concealment.

133.    The value of the subject vehicles has diminished as a result of Defendant's fraudulent concealment of the Defective Airbags and made any reasonable consumer reluctant to purchase any of the subject vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

134.    Accordingly, Defendant is liable for Plaintiffs' damages in an amount to be proven at trial.

135.    Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being, and with the aim of enriching Defendant.  Defendant's conduct, which exhibits the highest degree of reprehensibility,

being intentional, continuous, placing others at risk of death and injury, and affecting public safety, warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## SIXTH CAUSE OF ACTION
### Violation of the Oklahoma Consumer Protection Act,
### 15 Okl. St. § 751, *et seq.*

136.    The Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

137.    The sale or lease of the Defective Vehicles to the Plaintiffs under the guise that they were free from defects that would substantially impair the use, safety, or value of such vehicles represents an unlawful or deceptive trade practice under the Oklahoma Consumer Protection Act ("OCPA"), 15 Okl. St. § 751, *et seq*.

138.    Specifically, in the course of its business, Defendant failed to disclose and actively concealed the dangers and risks posed by the subject vehicles and/or Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.   Defendant also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the subject vehicles and/or the Defective Airbags installed in them.

139.    Takata has known of the Inflator Defect in the Defective Airbags since at least the 1990s.  Prior to installing the Defective Airbags in its vehicles, Defendant knew or should have known of the Inflator Defect, because Takata informed it that the Defective Airbags contained the volatile and unstable ammonium nitrate and Defendant approved Takata's designs.   In addition, Honda was made aware of the Inflator Defect in the Takata airbags in Honda's vehicles

in 2004, following a rupture incident.  And Defendant was again made aware of the Inflator Defect in Takata's airbags not later than 2008, when Honda first notified regulators of a problem with its Takata airbags.

140.    By intentionally failing to disclose and by actively concealing the Inflator Defect in the subject vehicles and/or the Defective Airbags installed in them, by permitting the subject vehicles to be marketed as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that values safety, Defendant engaged in an unconscionable act or practice under OCPA because, to the detriment of Plaintiffs, that conduct took advantage of their lack of knowledge, ability, and experience to a grossly unfair degree. That unconscionable act or practice was a producing cause of the economic damages sustained by Plaintiffs.  Defendant deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the subject vehicles.

141.    In the course of the Defendant's business, it willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above.  Defendant compounded the deception by repeatedly asserting that the subject vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that values safety.

142.    Defendant's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of subject vehicles and/or the

Defective Airbags installed in them, the quality of Defendant's brand, and the true value of the subject vehicles.

143.    Defendant intentionally and knowingly misrepresented material facts regarding the subject vehicles and/or the Defective Airbags installed in them with an intent to mislead the Plaintiffs.

144.    Defendant knew or should have known that its conduct was in violation of OCPA.

145.    Defendant made material statements about the safety and reliability of the subject vehicles and/or the Defective Airbags installed in them that were either false or misleading.

146.    To protect its profits and to avoid remediation costs and a public relations nightmare, Defendant concealed the dangers and risks posed by the subject vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the subject vehicles, and allowed them to continue driving highly dangerous vehicles.

147.    Defendant owed Plaintiffs a duty to disclose the true safety and reliability of the subject vehicles and/or the Defective Airbags installed in them because the Defendant:

     a.  Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

     b.  Intentionally concealed the foregoing from Plaintiffs; and/or

     c.  Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

148.    Because Defendant fraudulently concealed the Inflator Defect in the subject vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the subject vehicles has

greatly diminished.  In light of the stigma attached to the subject vehicles by Defendant's conduct, they are now worth significantly less than they otherwise would be.

149.    Defendant's failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in the subject vehicles were material to the Plaintiffs.  A vehicle containing components produced by a reputable manufacturer is worth more than an otherwise comparable vehicle containing critical safety components made by a disreputable manufacturer of unsafe products that conceals defects rather than promptly remedies them.

150.    Plaintiffs suffered ascertainable loss caused by Defendant's misrepresentations and its failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the subject vehicles and/or the Defective Airbags installed in them, and the Defendant's complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Defendant's misconduct.

151.    Defendant's violations present a continuing risk to the Plaintiffs, as well as to the general public.  Defendant's unlawful acts and practices complained of herein affect the public interest.

152.    Plaintiffs have provided adequate notice to Defendant.

153.    As a direct and proximate result of the Defendant's violations of OCPA, Plaintiffs have suffered injury-in-fact and/or actual damage.

154.    Plaintiffs seek monetary relief against Defendant in the amount of actual damages, as well as punitive damages because Defendant acted with fraud and/or malice and/or was grossly negligent.

155.    Plaintiffs also seek an order enjoining Defendant's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under OCPA.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiffs demand judgment against Defendant as follows:

a.    An order approving revocation of acceptance of the subject vehicles;

b.    Money damages, in the form of a refund of the full contract prices, including, trade-in allowance, taxes, fees, insurance premiums, interest, and costs, and a refund of all payments made by Plaintiffs on the subject contracts;

c.    Equitable relief including, but not limited to, replacement of the subject vehicles with new vehicles, or repair of the defective subject vehicles with an extension of the express and implied warranties, and service contracts which are or were applicable to the subject vehicles, in the event that Plaintiffs are not found to be entitled to revocation;

d.    Incidental and consequential damages;

e.    Punitive damages;

f.    Reasonable attorneys' fees; and

g.    Such other and further relief as this Court deems just and proper.

**TRIAL BY JURY DEMANDED ON ALL COUNTS**

Dated: October 10, 2019

Respectfully submitted,

*/s/ Sergei Lemberg*

Sergei Lemberg, Esq.
LEMBERG LAW, LLC
43 Danbury Road
Wilton, CT 06897
Telephone: (203) 653-2250
Facsimile: (203) 653-3424
slemberg@lemberglaw.com
*Attorneys for the Plaintiffs*

33